**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Mireles Harvesting and Packing Company, Inc.,

          Plaintiff,

vs.

Westport Insurance Corporation,

          Defendant.

No. CV 04-1448-PHX-NVW

**ORDER**

**[Not For Publication]**

The court has considered defendant's Motion For Summary Judgment (doc. # 48) ("Motion"), Defendant's Statement Of Facts In Support Of Motion For Summary Judgment (doc. # 49) ("DSOF"), Supplement To Defendant's Motion For Summary Judgment (doc. # 64), Defendant's Supplemental Statement Of Facts In Support Of Motion For Summary Judgment (doc. # 65), Plaintiff's Response To Defendant's Motion For Summary Judgment (doc. # 67) ("Response"), Statement Of Facts In Support Of Plaintiff's Response To Defendant's Motion For Summary Judgment (doc. # 68) ("PSOF"), Plaintiff's Response/ Objections To Defendant's Statement Of Facts In Support Of Motion For Summary Judgment (doc. # 69), Defendant Westport's Statement Of Disputed Facts (doc. # 76) and Reply In Support Of Motion For Summary Judgment (doc. # 75) ("Reply").

Plaintiff Mireles Harvesting And Packing, L.L.C. ("Mireles") brought this action against its insurer, Westport Insurance Corporation ("Westport Insurance"), alleging breach

1    of the parties' insurance contract and bad faith refusal to pay insurance proceeds. Mireles

2    filed insurance claims with Westport Insurance regarding three stolen harvest belts and

3    brought this action alleging that Westport Insurance failed to pay the amount owing under

4    the parties' insurance contract and refused to consider value-enhancing improvements

5    Mireles had made to the belts before they were stolen. Westport Insurance now moves for

6    summary judgment and, in the alternative, for partial summary judgment on specific issues

7    in the case.

8    **I.    Background**

9         Mireles leased the harvest belts in question from Salinas Equipment Distributors, Inc.

10   ("Salinas"), a wholly-owned subsidiary of RDO Equipment ("RDO"), in February of 2001.

11   (PSOF at ¶ 1.)  Mireles insured the belts with Westport Insurance on October 20, 2001,

12   through the Sundance Insurance Agency ("Sundance"), naming Salinas and RDO as "loss

13   payees" on the policy. (Complaint at ¶ 7; DSOF at ¶ 20.) The belts were stolen from Mireles

14   in Monterey County, California on or about July 11, 2002. (PSOF at ¶ 8.) Mireles reported

15   the theft to Deborah Blakesley, its insurance counselor at Sundance, who on August 2, 2002,

16   reported the claim to Westport Insurance's third-party administrator, Mattei Insurance

17   Services ("Mattei"). (DSOF at ¶ 12.)  Gary Mattison, the claims adjuster at Mattei,

18   confirmed receipt of the claim by letter to Mireles on August 7, 2002, requesting copies of

19   the rental agreement and any police reports and notifying Mireles that Mattei could not move

20   forward on the claim until the requested information was provided. (DSOF Ex. I.)  Over

21   three months later, on November 25, 2002, Deborah Blakesley provided Mattei the rental

22   agreement. (DSOF at ¶ 16; doc. # 69 at ¶ 16.) Nearly a month after that, Deborah Blakesley

23   provided Mattei the police report. (Reply Ex. VV at 1.)  At Mireles' express request,

24   Deborah Blakesley told Gary Mattison to direct all questions related to the value of the stolen

25   belts to Chris Harmon, an employee of RDO and Salinas. (DSOF at ¶ 17; doc. # 69 at ¶ 17.)

26        Gary Mattison then assigned an appraiser to value the stolen belts. After the appraiser

27   spoke with both Deborah Blakesley and Chris Harmon – per Mireles' instructions – the

28   appraiser calculated the replacement value of each belt to be $12,100, rendering a total

1    reimbursement amount after subtracting depreciation of $19,131.87.  (DSOF at ¶ 47.)  On

2    January 27, 2003, Chris Harmon informed Gary Mattison that RDO would accept payment

3    of that amount.  (DSOF at ¶ 48.)  After discussing the amount with Mireles, however, Chris

4    Harmon returned the check to Gary Mattison on February 10.  (DSOF at ¶ 51.)  Chris

5    Harmon explained that Mireles believed the amount was too low and that Mireles would

6    contact Gary Mattison to arrange final settlement.  (DSOF at ¶ 51, Ex. HH.)

7         Mireles did not contact Gary Mattison until nearly three months later, on May 7, 2003.

8    (DSOF at ¶ 52; Ex. W.)  On that date Mireles, through its lawyer, demanded payment in the

9    amount of $216,000.00.  (PSOF Ex. D.)  Mireles' lawyer calculated this figure based on a

10   quotation by Ramsay Highlander, Inc., offering with warranties an allegedly similar harvest

11   belt to the ones stolen for $72,000.  (*Id.*)

12        Mireles' explanation for its dramatically higher valuation of the belts is that after

13   leasing them, it made multiple expensive improvements to them to satisfy the requirements

14   of its contract with Dole Lettuce company.  (*See, e.g.*, PSOF Ex. E at 4; PSOF at ¶ 3.)  Ruben

15   Mireles ("Ruben"), the operations manager for Mireles, testified that he had informed Gary

16   Mattison of these improvements from as early as the date of the theft but that Gary Mattison

17   had repeatedly quelled Ruben's input on the matter, telling Ruben that "everything is under

18   control" and that Mattei had all the information it needed to process the claim.  (PSOF Ex.

19   I at 65-67.)

20        Mireles thus implies that Gary Mattison sent the check for $19,131.87 knowing the

21   amount to be inadequate.  (*See* doc. # 69 at ¶ 49.)  Mireles, however, admits having directed

22   all questions related to the value of the stolen belts to Chris Harmon, who had no knowledge

23   of and had never even seen the improvements to the belts.  (doc. # 69 at ¶ 17 (responding to

24   DSOF at ¶ 17); DSOF Ex. P at 47:10-25.)  Mireles thus asserts its dissappointment that

25   Westport Insurance's valuation of the belts excluded the costly improvements but, given its

26   express instructions to Westport Insurance, struggles to justify any expectation that those

27   improvements would be considered in the valuation.

28

1    After Mireles' $216,000 demand, presumably during subsequent discussions in May

2    of 2003, Mireles' lawyer indicated to Gary Mattison that Mireles was now the owner of the

3    belts, as opposed to RDO/ Salinas. (*See* DSOF Ex. W.) The change of ownership led Gary

4    Mattison to request on May 29, 2003, that Mireles' lawyer provide documentation of the

5    "sale" of the stolen belts from RDO/ Salinas to Mireles. (*Id.*) Mireles' lawyer complied over

6    six months later on December 11, 2003, providing Gary Mattison an assignment of rights and

7    an "Acknowledgment and Bill of Sale" by RDO, which stated that all payments owing by

8    Mireles to RDO had been paid in full. (PSOF Ex. E.) The "Acknowledgment and Bill of

9    Sale" and assignment of rights were dated October 20, 2003, over four months after Mireles'

10   lawyer's initial representation to Gary Mattison that Mireles owned the belts and nearly two

11   months before Mireles' lawyer provided them to Gary Mattison. (*Id.*) Mireles' lawyer later

12   explained to Gary Mattison that Mireles had purchased the belts from RDO pursuant to an

13   option clause in the lease, although the lease document itself contained no such clause.

14   (DSOF at ¶¶ 67-68; doc. # 69 at ¶ 68.)

15   After receiving the "sale" documents on December 11, 2003, Gary Mattison hired

16   Richard Kufner, an appraiser in Yuma County, to obtain documentation of the improvements

17   and to value them. (DSOF at ¶¶ 55-56.) Richard Kufner met with Ruben on January 16,

18   2004, to photograph a harvest belt allegedly identical to those stolen. (DSOF Ex. Z at ¶¶10-

19   12.) Richard Kufner also wrote to Ruben on January 20, 2004, requesting a breakdown of

20   costs of the improvements and noting that such information was necessary to process the

21   claim. (DSOF Ex. Z at ¶ 13.) Richard Kufner did not receive a response from Ruben,

22   despite writing two additional letters to Ruben requesting documentation of the

23   improvements. (DSOF Ex. Z at ¶¶ 13-17.) Richard Kufner also wrote to Chris Harmon

24   seeking confirmation that the photographed belt was similar to those lost but received no

25   response. (DSOF at ¶¶ 60-61.)

26   Gary Mattison also contacted Mireles seeking documentation of the costs of the

27   improvements by facsimile on January 23, 2004. (*See* DSOF Ex. AA.) Thirty-seven days

28   after Gary Mattison's facsimile, on March 1, 2004, Mireles' lawyer responded that Mireles

1   could not locate records for the period of time when the upgrades occurred.  (*Id.*)  Though

2   Mireles now contends that the records had been seized by the landlord – along with the

3   furniture – for failure to pay rent, in the letter Mireles' lawyer provided no reason for Mireles'

4   inability to produce the records.  (*See id.*)  According to the affidavit of Ruben, no one told

5   Mattei or Gary Mattison about the problem with the landlord because no one asked for an

6   explanation of Mireles' failure to provide documentation.  (PSOF Ex. A at ¶ 12.)

7       While stating on the one hand that the records for that period of time could not be

8   found, Mireles' lawyer also indicated in the same letter that no such documentation existed

9   because the upgrade work was done in-house.  (DSOF Ex. AA at 1-2.)  The letter further

10  stated that in any event, Mattei had earlier been provided precise descriptions of the belts as

11  they existed on the dates they were stolen.  (*Id.* at 2.)

12      On June 1, 2004, Westport Insurance's lawyer wrote a letter to Mireles describing the

13  issues surrounding Mireles' insurance claim and again requesting documentation of the

14  improvements to the belts.  (DSOF Ex. DD.)  Mireles, concerned about the approaching

15  statute of imitations deadline and believing Westport Insurance to be making duplicative

16  requests in order to stall, responded by notifying Westport Insurance of its intention to bring

17  this action.  (DSOF Ex. EE.)

18  **II.    Standard For Summary Judgment**

19      Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall

20  be entered if the pleadings, depositions, affidavits, answers to interrogatories, and admissions

21  on file show that there is no genuine dispute regarding the material facts of the case and the

22  moving party is entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c) (2004);

23  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The Court must evaluate a

24  party's motion for summary judgment construing the alleged facts with all reasonable

25  inferences favoring the nonmoving party.  *See Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104,

26  1117 (9th Cir. 2001).

27      The party seeking summary judgment bears the initial burden of informing the Court

28  of the basis for its motion and identifying those portions of the pleadings, depositions,

1   answers to interrogatories, and admissions on file, together with the affidavits, if any, which

2   it believes demonstrate the absence of any genuine issue of material fact.  *See Celotex Corp.*

3   *v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party has met its initial burden with

4   a properly supported motion, the party opposing the motion "may not rest upon the mere

5   allegations or denials of his pleading, but ... must set forth specific facts showing that there

6   is a genuine issue for trial."  *Anderson*, 477 U.S. at 248.  Summary judgment is appropriate

7   against a party who "fails to make a showing sufficient to establish the existence of an

8   element essential to that party's case, and on which that party will bear the burden of proof

9   at trial."  *Id.* at 322.  *See also Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir.

10  1994).  Although the initial burden is on the movant to show the absence of a genuine issue

11  of material fact, this burden may be discharged by indicating to the Court that there is an

12  absence of evidence to support the nonmoving party's claims.  *See Singletary v.*

13  *Pennsylvania Dep't of Corr.*, 266 F.3d 186, 193 n.2 (3d Cir. 2001).

14  **III.   Evidentiary Issues**

15      "It is well settled that only admissible evidence may be considered by the trial court

16  in ruling on a motion for summary judgment."  *Beyene v. Coleman Sec. Servs.*, 854 F.2d

17  1179, 1181 (9th Cir. 1988).  On this motion Westport Insurance objects to the affidavit of

18  Ruben on the grounds that it does not provide a foundation for his competency to testify,

19  basing the objection on Ruben's deposition testimony that Ruben was not an officer, director

20  or shareholder in the corporation.  (DSOF Ex. O at 10-11.)

21      The affidavit provides adequate foundation for Ruben's competency to testify.

22  Ruben's affidavit begins:  "At all times relevant to this matter, I was the Manager of Plaintiff

23  Mireles Harvesting and Packing, and I make this affidavit of my own personal knowledge."

24  (PSOF Ex. A.)  Ruben testified to having been manager "of all operations" at Mireles,

25  (DSOF Ex. O at 10-11), and Westport Insurance pervasively refers to Ruben on those terms

26  in its own briefs and statement of facts.  (*See* DSOF at ¶ 21.)  A manager in charge of "all"

27  operations, including "[l]abor, equipment, truckers, you name it," (DSOF Ex. O at 10 ln 23),

28  is as likely if not more likely to have the ability to convey information about the goings on

1    of the corporation than an officer, director or shareholder.  Ruben's competency to testify on

2    these matters requires no additional foundation.  *See Barthelemy v. Air Lines Pilots Ass'n*,

3    897 F.2d 999, 1018 (9th Cir. 1990) (holding that affiants' "personal knowledge and

4    competence to testify are reasonably inferred from their positions and the nature of their

5    participation in the matters to which they swore").

6         Westport Insurance also seeks a holding that the Ramsey Highlander quotation is not

7    evidence of the value of the harvest belts on the date of the alleged loss.  (Motion at 11:20-

8    22.)  Federal Rule of Evidence 403 states that "Although relevant, evidence may be excluded

9    if its probative value is substantially outweighed by the danger of unfair prejudice, confusion

10   of the issues, or misleading the jury . . . ."  Here, the court has reservations about whether a

11   mere quotation, as opposed to evidence of consummated sales, would be excessively

12   speculative to be considered legally relevant.  *Compare United States v. 179.26 Acres of*

13   *Land*, 644 F.2d 367, 371-72 (10th Cir. 1981) (noting that best evidence of market value is

14   comparable sales); *Cities Serv. Gas Co. v. United States*, 580 F.2d 433, 440-42 (Ct. Cl. 1978)

15   (holding that gas sales prices were the proper measure of market value).  The court need not

16   decide the issue on this motion, however.  Westport Insurance provides the court no authority

17   in support of its position that the quotation is inadmissible and therefore has not satisfied its

18   burden as the moving party.  *See* LRCiv 7.2(b) ("[T]he moving party shall serve and file with

19   the motion's papers a memorandum setting forth the points and authorities relied upon in

20   support of the motion.").  For purposes of this motion, then, the court assumes that the

21   Ramsey Highlander quotation is admissible.

22   **IV.   Validity Of The Policy**

23        Westport Insurance argues that by submitting an overstated and inflated valuation of

24   the allegedly lost property, Mireles has voided the entire insurance policy.  According to

25   Westport Insurance, the $72,000 Ramsay Highlander, Inc. quotation submitted by Mireles

26   was inflated because that price was for a sale including warranties, overhead and interest

27   costs of the seller and excluding any possible discount available for a cash sale.  Westport

28

1  Insurance touches on this point as both a general issue of insurance law and as an interpretive

2  matter related to these parties' contract.

3        **A.    General Insurance Law**

4        Westport Insurance provides no authority for the proposition that overstating an

5  insurance claim voids the entire policy as a general matter of insurance law.  The general

6  assertion to this effect by Westport Insurance's expert is not authority for this court.  *See*

7  Fed.R.Evid. 702 (establishing that the purpose of expert testimony is to "assist the trier of

8  fact to understand the evidence or to determine a fact in issue").  The court declines to

9  perform for Westport Insurance the research required to support its motion on this issue.  *See*

10  LRCiv 7.2(b) ("[T]he moving party shall serve and file with the motion's papers a

11  memorandum setting forth the points and authorities relied upon in support of the motion.").

12        **B.    Contractual Interpretation**

13        Westport Insurance suggests that Mireles has violated a provision of the insurance

14  contract related to fraud or misrepresentation and that the contract is therefore voided.  The

15  court gleans this argument from a footnote in the Motion citing the "Misrepresentation,

16  Concealment or Fraud" provision of the contract.  (Motion at 11 fn.2.)  Merely pointing to

17  a contractual provision without more is insufficient to properly raise the issue on a motion

18  for summary judgment.  Even if the issue were properly raised, Westport Insurance has not

19  shown a lack of factual dispute as to whether Mireles committed a fraud or

20  misrepresentation, which is a requirement of that provision.  The motion is therefore denied.

21  **V.    Valuation Of The Belts**

22        Westport Insurance seeks summary adjudication that the amounts payable to Mireles

23  under the contract are capped at a certain amount.  Due to the peculiar contractual language

24  involved, Westport Insurance's motion on this issue deals first with two of the stolen belts

25  and then with the third.

26        **A.    The First Two Belts**

27        A schedule from the contract lists "harvest belt" as Items 14 and 15 and gives $12,000

28  and $13,000 as payout limits.  (Complaint at Ex. A at M-1661 Ed. 1.0.)  Westport Insurance

1  therefore asks the court to hold that reimbursement be capped at $12,000 and $13,000 for two

2  of the three stolen belts, less depreciation.

3       Mireles contests this motion on two grounds.  First, Mireles argues that Items 14 and

4  15 do not correspond to the stolen belts.  (Response at 3:11-13.)  According to Mireles, all

5  three belts fall under Item 16, "Hired, Leased or Borrowed Equipment," which provides a

6  $200,000 payout limit.  (Complaint at Ex. A at M-1661 Ed. 1.0.)  Second, Mireles contends

7  that the amount payable should not be reduced by depreciation.  (Response at 4:27-28.)

8                    **1.    The Correct Belts**

9       The only reasonable interpretation of the contract is that Items 14 and 15 refer to two

10 of the stolen belts.  The contract indicates that the belts in Items 14 and 15 were leased from

11 Salinas.  (Complaint Ex. A at IM-1271 Ed. 1.0.)  At oral argument counsel for Mireles

12 conceded that the only belts leased from Salinas by Mireles were the three stolen belts.  If

13 no other belts were leased from Salinas, then the two referred to in Items 14 and 15 had to

14 be two of the three stolen.

15      At oral argument counsel for Mireles argued that the two belts should nonetheless fall

16 within the umbrella provision of Item 16.  Whether or not the additional policy limit in Item

17 16 also applies to the two belts, however, is irrelevant, given that liability for the belts in

18 Items 14 and 15 is specifically capped at $12,000 and $13,000.

19      Mireles has submitted no parol evidence to suggest, moreover, that the parties

20 intended upon entering into the contract that only the $200,000 limit of Item 16 should be

21 applied to these two belts.  Ruben's affidavit states that Deborah Blakesley of Sundance

22 represented to Ruben that the $200,000 limit applied to the three harvest belts (PSOF Ex. A

23 at ¶ 5), but nothing in the record suggests Deborah Blakesley was an agent of Westport

24 Insurance such that her statements could bind Westport Insurance.  Counsel for both parties

25 agreed at oral argument that Deborah Blakesley was not an agent for Westport Insurance.

26 Even if Deborah Blakesley did have some authority to bind Westport Insurance, Ruben's

27 affidavit makes no suggestion that Deborah Blakesley's statements to Ruben were made

28

1    during contract negotiations or before the contract was executed.  The statement is therefore

2    not parol evidence of the mutually intended meaning of the contract language.

3         Ruben's other affidavit suggestion — that he "understood" the contract to provide

4    $200,000 coverage for the belts — is similarly not parol evidence of the mutually intended

5    meaning of contractual language.  The statement does not relate specifically to occurrences

6    prior to or contemporaneous with the contract's execution.  Moreover, the statement shows

7    only Ruben's purely subjective understanding, and nothing in the record suggests Westport

8    Insurance had any reason to know of that understanding.  *Compare Hill-Shafer Partnership*

9    *v. Chilson Family Trust*, 165 Ariz. 469, 474, 799 P.2d 810, 815 (1990) ("The manifestations

10   of the parties are operative in accordance with the meaning attached to them by one of the

11   parties if . . . the other has reason to know the meaning attached by the first party.") (citing

12   Restatement (Second) of Contracts § 20 (1979)).

13        In any event, the court finds this statement to be sham testimony, submitted to create

14   an issue of fact on summary judgment.  *See, e.g.*, *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d

15   262, 266-67 (9th Cir. 1991).  Ruben's affidavit testimony on this point recants his prior

16   deposition testimony that Items 14 and 15 were two of the belts reported stolen.  (*See* PSOF

17   Ex. A at ¶¶ 5, 13; DSOF Ex. O at 20:24-21:17.)  Ruben's affidavit testimony is not a

18   clarification or explanation of his deposition testimony but an attempt to escape the prior

19   admission.  Ruben had an opportunity to earlier fix any erroneous statements in his testimony

20   but only did so in order to oppose the motion for summary judgment.  The testimony is

21   therefore disregarded.  *Cf. Hambleton Brothers Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d

22   1217, 1226 (9th Cir. 2005) (holding that district court did not abuse its discretion by striking

23   deposition errata for failure to comply with the procedural requirements of Rule 30(e) and

24   citing *Rios v. Bigler*, 67 F.3d 1543 (10th Cir. 1995), as "holding that requesting review is an

25   absolute prerequisite for correcting a deposition under FRCP 30(e)").

26        The only other evidence submitted by Mireles is the notice of loss, sent by Deborah

27   Blakesley to Westport Insurance, in which Deborah Blakesley identified coverage for the

28   claim as falling under the $200,000 rental equipment provision.  (PSOF Ex. J at 1.)  The

1    actions of Deborah Blakesley after the theft, however, do not shed light on what the parties'

2    mutually communicated understanding was when the contract was made.

3                              **2.    Depreciation**

4           Westport Insurance has not carried its burden to show that its calculation of

5    depreciation, or of the effect of that depreciation on the reimbursement amount, was correct.

6    Both parties agree that the reimbursement amount should be "actual cash value," which the

7    contract defines as replacement value less depreciation (Compl. at Ex. A at IL 01 03 06 99),

8    but nothing suggests that Mattei's calculation of depreciation was appropriate or that the

9    reduction for depreciation must reduce the reimbursement amount below the policy limit.

10   Mireles, for its part, has provided evidence that the harvest belts were regularly repaired, in

11   good shape, and had a replacement value of $72,000.  (PSOF Ex. A at ¶ 7; PSOF Ex. D.)

12   Without evidence or authority to support its position that "actual cash value" should be

13   calculated by subtracting depreciation from the policy limit, Westport Insurance is not

14   entitled to summary judgment on this issue.

15                     **3.    Westport Insurance's Alternative Motion**

16          In the alternative, and without explanation, Westport Insurance asks the court to hold

17   that reimbursement for these two belts be capped at $12,754, which is two-thirds of the

18   $19,131.87 originally calculated by Gary Mattison's appraiser. (Motion at 12:19-21.) Since

19   Westport Insurance has not explained or provided authority for its motion and has not cited

20   contractual language suggesting Gary Mattison's appraiser appropriately calculated the

21   reimbursement, Westport Insurance has failed to carry its initial burden on summary

22   judgment.  The court therefore denies Westport Insurance's alternative motion.

23            **B.    The Third Belt**

24          Westport Insurance moves for summary adjudication that the third harvest belt stolen

25   had a maximum value of $18,000.  As evidence that the third stolen belt could be worth no

26   more than $18,000, Westport Insurance submits: (1) an insurance policy purchased by

27   Mireles after the theft covering what was apparently a fourth harvest belt for up to $18,000

28

1  (DSOF Ex. D at 1), and (2) evidence that Mireles owned a harvest belt in identical condition
2  to the ones stolen (DSOF Ex. Z at ¶¶ 10-11).

3          Westport Insurance's evidence is insufficient to show entitlement to judgment as a
4  matter of law.  To begin with, the belt insured for $18,000 might have been a different kind
5  than the three stolen.  Moreover, no evidence has been placed before the court to suggest that
6  the newly-insured belt was the same belt as the one in identical condition to those stolen.
7  Even if it were, the insured value in a new insurance contract does not conclusively indicate
8  the belt's "actual cash value" as that term was used in a prior contract; an insured need not
9  insure its property for the full value.  Westport Insurance has merely submitted circumstantial
10 evidence opposing Mireles' evidence about the value of the stolen belts and is therefore not
11 entitled to summary judgment.

12 **VI.    Breach As Of May 7, 2003**

13         Westport Insurance moves for summary adjudication that it did not breach the
14 insurance contract as of May 7, 2003.  Because payment of an incorrect amount could be a
15 breach of the contract and as of yet it is unclear how much Westport Insurance owed,
16 Westport Insurance's attempted payment of $19,131.87 may have been a breach.  The court
17 therefore denies the motion.

18 **VII.   Tortious Refusal To Pay Insurance Proceeds**

19         Westport Insurance has moved for summary judgment on Mireles' claim of bad faith,
20 arguing that no reasonable jury could find that Westport Insurance had treated Mireles
21 unfairly.  The covenant of good faith and fair dealing requires the insurer to "deal fairly with
22 an insured, giving equal consideration in all matters to the insured's interests." *Rawlings v.*
23 *Apodaca*, 151 Ariz. 149, 157, 726 P.2d 565, 573 (1986) (emphasis omitted).  On summary
24 judgment, the issue in bad faith cases is "whether there is sufficient evidence from which
25 reasonable jurors could conclude that in the investigation, evaluation, and processing of the
26 claim, the insurer acted unreasonably and either knew or was conscious of the fact that its
27 conduct was unreasonable." *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 238,
28 995 P.2d 276, 280 (2000) (citations omitted).  "A failure to pay a claim is unreasonable

1    unless the claim's validity is 'fairly debatable' after an adequate investigation." *Rawlings*, 151

2    Ariz. at 156, 726 P.2d at 572 (citations omitted).  The argument that a claim was "fairly

3    debatable," however, and that nonpayment was therefore reasonable "cannot be raised where

4    the insurer failed to make an adequate investigation."  *Id.* (citing *Farr v. Transamerica*

5    *Occidental Life Ins. Co.*, 145 Ariz. 1, 699 P.2d 376 (App. 1984)).

6         Mireles opposes Westport Insurance's motion by arguing that Mattei's investigation

7    into the value of the stolen belts was inadequate.  (Response at 6-7.)  On the evidence

8    submitted, however, no reasonable jury could conclude that Westport Insurance's

9    investigation was inadequate.  At a minimum, no reasonable jury could assign fault to

10   Westpoint Insurance regarding its investigation.

11        Up until May of 2003, Mattei investigated precisely according to Mireles' directions.

12   Mireles does not deny that it referred all questions related to valuation of the belts to Chris

13   Harmon.  (doc. # 69 at ¶ 17 (responding to DSOF at ¶ 17).)  Mireles cannot now legitimately

14   argue that Mattei's observance of Mireles' instructions – by predominantly questioning Chris

15   Harmon about the value of the belts – was improper.  Regardless of what information Chris

16   Harmon actually had (*see* DSOF Ex. P at 47:10-25), Mattei was following Mireles' direct

17   counsel on how to best obtain knowledge about the value of the belts.

18        Subsequent investigation was largely stifled by Mireles and its employees.  The

19   appraiser assigned by Gary Mattison sent Ruben three letters asking for information about

20   the improvements to the belts but never received a response.  (DSOF Ex. Z at ¶¶ 13-17.)

21   Gary Mattison's parallel inquest to this effect remained unanswered for thirty-seven days, and

22   Mireles in response provided contradictory information about the documentation sought; the

23   documentation could not be located, but there was no documentation.  (DSOF Ex. AA.)  At

24   no time did Mireles or any of its agents explain why the documentation requested was

25   unavailable (PSOF Ex. A at ¶ 12), presenting Mattei instead with a suspicious wall of silence.

26        In the absence of any explanation as to why Mireles was refusing to provide the

27   documentation, Westport Insurance's decision to press for that documentation as evidence

28   of the value of the stolen belts was very reasonable.  The only basis for valuation provided

1    by Mireles was a quotation for new belts, costing roughly seven times the stolen belts' value

2    as originally estimated and agreed upon by Chris Harmon.  (PSOF Ex. D.)  Ruben himself

3    testified that due to the improvements, the stolen belts would be particularly hard to value,

4    and that he did not believe anyone could value them.  (DSOF Ex. O at 67:24-25 to 68:1-3.)

5    Under the fair assumption that documentation of the improvements existed but was being

6    withheld, and in light of the difficulty of the undertaking and the unresponsiveness of

7    Mireles' employees, Westport Insurance's pursuit of documentary evidence of the

8    improvements' cost was a very reasonable approach to narrowing the scope of possible

9    valuation for the stolen belts.

10        Westport Insurance was expressly entitled, moreover, to press for documentation.  The

11   contract places the burden of providing such documentation on Mireles.  (Complaint at Ex.

12   A at IM-7001 Ed. 1.1 ("**Records** – 'You' must produce records, including tax returns and

13   bank microfilms of all cancelled checks relating to value, loss and expense and permit copies

14   and extracts to be made of them as often as 'we' reasonably request.).)  The parties agreed at

15   oral argument that this provision requires the insured to provide evidence of its loss.

16        Lastly, although Mireles does not contest Westport Insurance's motion on the ground

17   of investigatory delay, Mattei's investigation was significantly delayed by Mireles.[1]  At each

18   step of the way, Mireles took excessive time in providing the documentation sought by

19   Westport Insurance or in articulating any other form of response.  Although no evidence in

20   the record reveals precisely when Mireles submitted the original documentation required to

21

22        [1] Considering that Mireles brought this action out of concern that Westport Insurance
23   was stalling to invoke the statute of limitations (DSOF Ex. EE), any argument based on
     investigatory delay is noticably absent from Mireles' briefs.  Mireles' responsibility for
24   creating the delays may explain its decision not to make the argument, which is otherwise
     a potential basis for alleging bad faith.  *See, e.g.*, *Rawlings*, 151 Ariz. at 156, 726 P.2d at 572
25   ("[A]n insurer that intentionally and unreasonably denies *or delays* payment breaches the
     covenant of good faith owed to its insured." (emphasis added; citations omitted)); *Zilisch*,
26   196 Ariz. at 237, 995 P.2d at 279 ("The tort of bad faith arises when the insurer intentionally
     denies, *fails to process* or pay a claim without a reasonable basis." (emphasis added; citations
27   and internal quotations omitted)).
28

1  process the claim, Mattei did not receive the two necessary documents until three and four

2  months after the claim was submitted.  (DSOF ¶ 16; doc. # 69 at ¶ 16; Reply Ex. W.)  After

3  Mireles rejected the initially agreed-upon reimbursement and Gary Mattison was informed

4  that Mireles would contact him to arrange final settlement, Mireles did not do so for three

5  additional months.   (DSOF at ¶ 52; DSOF Ex. W; PSOF Ex. D.)   When asked for

6  documentation of the sale of the stolen belts to Mireles, the acknowledgement of sale was

7  not provided for six months, nearly two months after its execution.  (PSOF Ex. E.)  Finally,

8  when asked for documentation of the improvements, Ruben simply failed to respond, and

9  Mireles waited thirty-seven days to assert that the documents were unavailable and did not

10  exist.

11          **IT IS THEREFORE ORDERED** that Westport's Motion for Summary Judgment

12  (doc. # 48) and Supplement To Defendant's Motion For Summary Judgment (doc. # 64) are

13  granted in part and denied in part.  Westport Insurance's motion for summary adjudication

14  that two of the belts are subject to liability caps of $13,000 and $12,000 is granted, as is the

15  motion for summary judgment on the bad faith claim.  All Westport Insurance's other

16  motions are denied.

17          DATED this 1st day of March 2006.

20  _____
    Neil V. Wake
21  United States District Judge